# CIRCUIT COURT OF ORANGE COUNTY

Commonwealth of Virginia

v.

James Henry Long, Jr.

April 20, 2007

Case Nos. CR05-145, CR05-157

By Judge Daniel R. Bouton

I set forth below the court's ruling on the motion to set aside the verdicts in the above referenced case.

*Procedural History*
*and Statement of Relevant Trial Facts*

On September 14, 2006, the defendant was convicted by a jury of two counts of first degree murder and two counts of using a firearm in the commission of murder. Subsequent to the trial and prior to sentencing, the defendant filed a motion to set aside the verdicts based on a claim that the Commonwealth failed to disclose certain exculpatory evidence regarding Robin Browning, one of the principal witnesses for the prosecution. The motion alleged a violation of the *Brady* doctrine and requested a new trial. A hearing was conducted on the *Brady* motion on March 12, 2007.

It is not necessary to review in detail here the vast quantity of evidence that was introduced by both sides when the case was tried. For purposes of this ruling, however, it is important to note that a crucial witness for the Commonwealth was the defendant's companion of many years, Robin Browning. She cooperated fully with law enforcement in all phases of the prosecution that was instituted against Mr. Long. She testified for the Commonwealth at the preliminary hearing and at a pretrial suppression hearing in the circuit court. She was also a key prosecution witness at trial.

The Commonwealth's theory of the case was that the defendant used Robin Browning's car, a red Corvette, to drive to the location where he shot and killed the victims, Vickie Truax and William Browning. After the murders, he then drove back to the home that he had shared for many years with Ms. Browning. Almost immediately, law enforcement officials launched an intensive and exhaustive investigation. Within hours of the crimes, the police arrived at the defendant's door and began gathering evidence.

Ms. Browning and the defendant were present at the home when the police first appeared shortly after the bodies of the victims were discovered. At that time, they each made a number of statements to various law enforcement officers. Based on the evidence that had been gathered and the information that had been developed by law enforcement in the ongoing investigation, both of them were suspects in the murders. However, neither was arrested or charged with murder when the police first confronted them at home. Rather, the initial charges that were brought against them did not relate directly to the killings. In this regard, on March 19, 2005, Mr. Long and Ms. Browning were each charged with two separate felony drug offenses: possession of a controlled substance and possession of marijuana with the intent to distribute. These charges resulted from the evidence that was collected from the home that the two of them shared.

The investigation into the murders continued at a rapid pace. On March 22nd, a few days after the police spoke to him at his residence, the defendant was charged with the murder of Vickie Truax and the use of a firearm during the commission of the crime. At that point, no charges were brought against either Mr. Long or Ms. Browning for the killing of William Browning. As the murder investigation continued to progress, Ms. Browning remained a suspect. Soon after Mr. Long had been charged with the Truax killing, she retained counsel to assist her, and a dialogue was instituted between her attorneys and the Commonwealth's Attorney. In May of 2005, Ms. Browning began cooperating with the Commonwealth. As part of her cooperation, she gave consent to search the home and the premises where she resided with the defendant. Several items of evidence were eventually found, including the murder weapons.

As noted previously, Ms. Browning also testified at the preliminary hearing in Mr. Long's case. This hearing took place on June 30, 2005. At that time, the drug charges, the Truax murder charge, and the firearm charge for which Mr. Long had been arrested were certified to the grand jury for the July Term of Court. When the grand jury convened on July 25, 2005, Mr. Long was indicted on all of the certified charges. On that date, he was also indicted for the murder of William Browning and for the use of a firearm in the commission of the crime. These new charges were based on independent indictments that were presented to the grand jury by the Commonwealth's Attorney.

By the time the case landed in the circuit court, the defense was fully aware that Robin Browning would be a crucial witness for the Commonwealth. Therefore, in order to prepare for her cross-examination at trial, the defendant filed a comprehensive pretrial discovery motion in the circuit court. Among other things, the defendant requested the following:

> 4. Pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), *Stover v. Commonwealth*, 211 Va. 789, 180 S.E.2d 504 (1971), and *Dozier v. Commonwealth*, 219 Va. 1113, 253 S.E.2d 655 (1979), all information of whatever form, source, or nature which tends to exculpate the defendant or reduce the penalty which he might suffer should he be convicted in this matter, through an indication of innocence or through the impeachment of any prosecution witness, be it by inconsistent statements or otherwise. This material includes, but is not limited to, the criminal arrest and conviction record of any witness who will testify on behalf of the Commonwealth at trial and all information of whatever form, source, or nature which could be beneficial to the defendant at trial.
>
> 5. Pursuant to *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), all evidence affecting the credibility of any prosecution witness(s),[1] including but not limited to the sum and substance of any plea negotiation *existing between the Commonwealth and any prosecution witness(s) who will testify in the trial of this case to include continuances, bond consideration, reduced charges, and any benefit for such witness(s) communicated to said witness directly or indirectly by a third party.*

(Emphasis mine.)

Based on the motion, an order was entered that required both sides to exchange discovery information in accordance with a schedule fixed by the court. The order required the Commonwealth to produce many items and to provide a significant quantity of information, including the exculpatory evidence requested by the defendant described in the preceding paragraph. Consistent with the order and the principles of law that govern discovery in criminal cases, each side was also required to supplement their respective responses until the trial was concluded.

---

[1]     To include all statements made by said witness to Law Enforcement directly or indirectly in regard to the shooting on March 18, 2005, and the alleged individual(s) involved.

The Commonwealth filed a number of responses and made available to the defense a great deal of evidence both before and after the discovery order was entered. In only one filed response, however, did the Commonwealth identify for the defendant any exculpatory information about Robin Browning. Specifically, in paragraph four of its first response, the Commonwealth addressed the status of Ms. Browning under the heading "Potentially Exculpatory Evidence Known to the Commonwealth." According to the Commonwealth, such evidence included only the following about her:

a. Commonwealth witness Robin Browning testified at preliminary hearing that the defendant told her he killed William Browning. She further testified as to the actions she and the defendant had taken earlier that day. When originally interviewed by Investigator LaCasse, she did not tell him that the defendant had told her he had killed William Browning. She also told the investigator that she and the defendant had gone to get ice cream at his mother's after they had been by William Browning's property two different times. At preliminary hearing she said that the defendant had asked to borrow her car because he wanted to go get ice cream at his mother's.

b. Robin Browning obtained a warrant against the defendant for malicious wounding in 1993. She alleged he had cut her shirt off her back and made bloody cuts on her back. At preliminary hearing in general district court, she testified that she and the defendant had had an argument and that her back had been cut on brambles climbing over or under a fence. She later entered a plea agreement wherein she was convicted of giving a false statement to police.

c. Robin Browning is currently charged with drug and firearm charges. She was released on bond, which was put up by her sister. Subsequently, Ms. Browning's sister revoked the security she had provided for the bond, and the bondsman revoked Ms. Browning's bond. While in the presence of the bondsman and the magistrate, Ms. Browning advised that she had taken an overdose of her prescribed medications, collapsed, and was taken to the hospital, where she remained in critical condition for a number of days, recovered, and was released and placed in jail. At a subsequent bond hearing she testified that she did not want to commit suicide in taking the overdose, she did not want to go back to jail.

After the evidence described in the preceding paragraphs a, b, and c was provided to the defense, the Commonwealth filed an additional discovery response based on a specific request from the defense for inconsistent statements made by Robin Browning. In this regard, in a filing dated August 12, 2006, the Commonwealth provided to the defense a number of written and oral statements that were made by Robin Browning. However, the filing did not make any reference to Ms. Browning's role in the case, nor did it include any details about her relationship with the Commonwealth. Furthermore, no subsequent filing that contained any exculpatory evidence or any information that could be used to impeach Ms. Browning was made by the Commonwealth. Therefore, in preparing for trial, the defense relied on the exculpatory evidence that was disclosed about Ms. Browning in the Commonwealth's initial discovery response and in the statements that were provided in the second filing.

In the meantime, as the prosecution against Mr. Long progressed, Ms. Browning's case also found its way to the circuit court. She had waived her right to a preliminary hearing in the general district court on the drug charges that were pending against her. Consequently, her case was certified to the grand jury, and she was indicted in the circuit court on November 28, 2005. Once Ms. Browning's drug charges ended up in the circuit court, no action was taken on them before the defendant's trial other than to continue them. Therefore, when she testified against Mr. Long, Ms. Browning's charges simply remained on the court's docket.

The description of what evidence the Commonwealth disclosed about Ms. Browning and the procedural history of the charges brought against her constitute the background to what occurred at trial. Beginning on September 6, 2006, and continuing for several days, Mr. Long was tried by a jury on the two homicide charges and the two firearm charges. The two felony drug charges pending against him were not tried when he was prosecuted for the murders; they also remained as separate charges on the court's docket.

On the witness stand, Ms. Browning provided direct and circumstantial evidence that, if believed, was devastating to the defense. She linked the defendant to her vehicle, which the Commonwealth asserts was being driven by Mr. Long when he shot and killed Vickie Truax and William Browning. She provided testimony that tied the defendant to the weapons that the Commonwealth maintains were used to commit the killings. Finally, she testified about incriminating statements that were made by the defendant. Specifically, she testified that Mr. Long told her that "he had killed Willie." (Robin Browning Testimony, p. 17.) This statement was allegedly made by the defendant after he returned home in Ms. Browning's car and before the police arrived to question the two of them.

The cross-examination of Ms. Browning was one of the most critical components of the defendant's case. In response to vigorous and pointed

questioning about her potential bias and her motives, Ms. Browning testified that she had been promised nothing by the Commonwealth (Robin Browning Testimony, p. 28.) She said that the only reason that she decided to have her own cases postponed multiple times was so that she could finish serving whatever period of incarceration would be imposed on her: "I mean, go ahead and stay in and do the time and then get out." (Robin Browning Testimony, p. 67.) She explicitly denied that she allowed her cases to be continued so that she could first be given an opportunity to testify for the Commonwealth against the defendant. (Robin Browning Testimony, p. 45.) She also stated without qualification or reservation that she did not think that her testimony would result in any benefit to her. (Robin Browning Testimony, p. 46.)

After the jury convicted Mr. Long, the court set a date for sentencing and ordered that a presentence report be prepared. In the interim, the defense claimed to have learned of certain information regarding Ms. Browning that was allegedly not available prior to trial. The defense asserted that such evidence was exculpatory and that it should have been disclosed by the Commonwealth. Therefore, the motion that is now before the court was filed, and a hearing was requested to determine whether the Commonwealth had violated what is widely known as the *Brady* doctrine. The hearing occurred on March 12, 2007.

## The Brady Hearing

At the hearing that was conducted on the *Brady* violation, the full extent of Ms. Browning's pretrial involvement with the Commonwealth was revealed. The evidence at the hearing established that, shortly after the murders were committed and while the investigation was still underway, the Commonwealth had actually instituted the arrangements that triggered Ms. Browning's cooperation and that eventually led to her trial testimony. Most important, these arrangements contained a substantial amount of exculpatory evidence that was in the possession of the Commonwealth and that was not disclosed to the defense prior to the trial. In particular, at the *Brady* hearing, the court learned of three major items of evidence that were not disclosed.

First, in May of 2005, after Mr. Long had been charged with the murder of Vickie Truax and, while Ms. Browning was still a suspect, the Commonwealth made a promise and extended a benefit to Ms. Browning. Specifically, in order to induce her to cooperate, Ms. Browning was advised that she would not be charged with the murders. This was proven through the undisputed testimony of Mr. Snook and the affidavit of Ms. Lepold, the two attorneys who represented Ms. Browning. Mr. Snook testified that he had been retained by Ms. Browning to represent her on the drug charges and

on possible murder charges. He said that Ms. Browning began cooperating with law enforcement when she was informed by the Commonwealth's Attorney that she would no longer be considered a suspect in the murders and that she would not be prosecuted for them. Mr. Snook verified that these arrangements began when his associate, Ms. Bonnie Lepold, met with the Commonwealth's Attorney and Ms. Browning on May 5, 2005.

Ms. Lepold's affidavit, admitted without objection and unchallenged by the Commonwealth, is completely consistent with Mr. Snook's uncontradicted testimony. In the affidavit, Ms. Lepold stated that, prior to her client's first meeting with law enforcement, she "had telephone contact with Ms. Wheeler." Ms. Lepold went on to say that "based on our conversation, it was my understanding that *Ms. Browning was not going to be charged with the murders* for which Mr. Long had already been arrested. *This information had been relayed to Ms. Browning, and based on this, she had agreed to cooperate with law enforcement* in its ongoing murder investigation." (Lepold Affidavit, paragraph 4; emphasis mine.)

The second item of exculpatory evidence that was not disclosed was that in addition to being promised that she would not be charged with the murders, the Commonwealth communicated to Ms. Browning that some benefit would accrue to her on her pending drug charges based on the cooperation and the testimony that she was expected to provide in the case against Mr. Long. On this point, Mr. Snook testified that there was an "implication" or an "understanding" that Ms. Browning would receive some benefit for her testimony. It did not involve a specific promise of a reduced sentence. Mr. Snook said that it was "looser than that"; however, there was "always the implicit assumption" of some consideration from the Commonwealth in exchange for Ms. Browning's testimony. Similarly, Ms. Lepold stated under oath in her affidavit that it was her "understanding that Ms. Browning *would receive some benefit* for her cooperation with law enforcement and the prosecutor and *this information was relayed to Ms. Browning.*" (Lepold Affidavit, paragraph 5; emphasis mine.)

The third and final item of exculpatory evidence in the possession of the Commonwealth that was not disclosed was a plea agreement offer made to Ms. Browning prior to trial. Specifically, on May 4, 2006, more than four months before she testified at trial, a plea agreement that disposed of her pending drug charges was offered to Robin Browning by the Commonwealth. The agreement was reduced to writing and faxed to Mr. Snook by the Commonwealth's Attorney. In the proposed agreement, the Commonwealth promised to *nolle prosse* one of the two felony charges and give Ms. Browning the opportunity to have the remaining charge dismissed under the provisions of § 18.2-251 of the Code of Virginia. Ms. Browning chose not to accept this first offer. Rather, after she testified and the defendant was convicted, she accepted a second plea agreement offer from the Commonwealth.

The ultimate result in Ms. Browning's case is not germane to the analysis here because her plea agreement was not finalized until after Mr. Long's trial. However, as a result of the promises made by the Commonwealth in the second plea agreement offer, Ms. Browning received one misdemeanor conviction, and she was sentenced to a period of incarceration that consisted of "time served." Thus, it is arguable that the Commonwealth's second plea offer, made to Ms. Browning after she testified against Mr. Long, was indeed more favorable to her.

Ms. Browning's decision not to accept the Commonwealth's first offer prior to her testimony against Mr. Long does not in any way negate or diminish the exculpatory nature of the proposed plea agreement in this case, especially when one considers the other evidence regarding Ms. Browning's relationship with the Commonwealth. Specifically, the offer directly supports and confirms the testimony provided by Mr. Snook and Ms. Lepold that Ms. Browning expected to receive some benefit from the Commonwealth for her testimony at trial. The Commonwealth's generous offer can also be viewed as a reward to Ms. Browning for her cooperation up to that point. Moreover, since the offer was made before she testified, it can arguably be seen as an effort by the Commonwealth to induce her continued cooperation and to motivate her as a witness at the pending trial. It is also evidence that there was at least some discussion between the Commonwealth and the defense concerning the extent and the details of a benefit for Ms. Browning long before she was called to the stand to testify against Mr. Long. In short, for many reasons, the first plea offer made by the Commonwealth is also exculpatory evidence in this case.

At the *Brady* hearing, the Commonwealth did not challenge or dispute any of the evidence that was introduced by the defendant on the motion to set aside the verdicts. Moreover, the Commonwealth did not present any independent evidence of its own at the hearing. The Commonwealth also admitted that none of the information set forth above was contained in any document that was filed with the court or that was delivered to counsel for the defendant. The Commonwealth conceded that the only exculpatory evidence in the record that was ever turned over to the defendant regarding Ms. Browning's role in the prosecution and her relationship with the Commonwealth consisted of the information set forth in the three paragraphs described above, paragraphs a, b, and c, and in the statements that were provided in the second filing.

Once the evidence was introduced by the defense on the *Brady* violation, the Commonwealth argued that defense counsel was generally aware of Ms. Browning's cooperation and of her role in the case. In support of this assertion, the Commonwealth points to a number of informal conversations that occurred between defense counsel and the Commonwealth's Attorney. However, the court was not advised of any conversation in which the Commonwealth explicitly told the defense that

Ms. Browning's cooperation began when she was formally notified by the Commonwealth's Attorney that no murder charges would be brought against her. There was no representation that the defendant was made aware of the date that Ms. Browning was told that she would not be prosecuted and that this prosecutorial decision was formally communicated to her counsel. Moreover, there was no reported conversation during which the defense was directly told that some benefit would be extended to Ms. Browning by the Commonwealth on the charges pending against her after she finished cooperating with law enforcement in the case against Mr. Long. Finally, with respect to the promises contained in the first plea agreement that was offered, the Commonwealth simply conceded at the *Brady* hearing that a copy of the agreement was never disclosed and that the defense was never apprised of its existence or of its terms.

Based on the hearing that was conducted on March 12th, the court concludes that a *Brady* violation occurred in this case. In particular, the court finds that the following exculpatory evidence was not provided to the defense prior to the trial.

1. Robin Browning was a suspect in the murders for which the defendant was ultimately convicted. In the early stages of the investigation, she retained counsel, and her attorneys engaged in discussions with the Commonwealth's Attorney about her role in the case. In May of 2005, the Commonwealth's Attorney promised Ms. Browning that she would not be charged or prosecuted for the murders. This decision was communicated to her by both of her attorneys. Based on the Commonwealth's decision not to prosecute her for the murders, Ms. Browning's unbroken period of cooperation with law enforcement commenced. Ms. Browning's cooperation was based on the Commonwealth's decision not to charge her with the murders.

2. The Commonwealth's Attorney also engaged in discussions with Ms. Browning's counsel regarding the extent of her cooperation. While there was no final agreement until after the defendant was convicted, it was understood that Ms. Browning's testimony would benefit her in any decisions that were reached regarding how the charges pending against her would be resolved. The expectation of a benefit was part and parcel of her arrangements with the Commonwealth in May of 2005 when she first began cooperating. Both of the attorneys who represented her advised her that some benefit would result from her cooperation and her testimony.

3. Based on the contact that occurred between the Commonwealth's Attorney and defense counsel, the Commonwealth actually made a formal plea agreement offer to Ms. Browning on May 4, 2006. The terms offered by the Commonwealth included a promise to *nolle prosse* one of the charges pending against her and to treat the remaining charge under the provisions of § 18.2-251 of the Code of Virginia. The agreement that was offered is consistent with Ms. Browning's expectation that she would

receive some benefit from the Commonwealth for her testimony and for her cooperation. It also reflects that conversations about what benefit Ms. Browning would receive were actually taking place before the trial of Mr. Long. Furthermore, since Ms. Browning rejected the Commonwealth's first plea offer, it demonstrates that she had knowledge of the plea negotiations before she testified.

## Issue before the Court

Must the verdicts be set aside and a new trial granted to Mr. Long because of the Commonwealth's failure to disclose exculpatory evidence in violation of the *Brady* doctrine?

## Discussion of the Law and Legal Analysis

The principles of law that apply to whether a new trial must be awarded because of the Commonwealth's failure to disclose exculpatory evidence are well established and have been widely followed for many years. The Supreme Court of Virginia discussed them at length in the recently decided case of *Workman v. Commonwealth*, 272 Va. 633, 636 S.E.2d 368 (2006). In *Workman*, the court reversed the defendant's conviction for voluntary manslaughter and ordered that a new trial be granted because of the Commonwealth's failure to disclose exculpatory evidence. There, the three issues that must be addressed by the court in the present case were identified:

> There are three components of a violation of the rule of disclosure first enunciated in *Brady*: (a) the evidence not disclosed to the accused must be favorable to the accused, either because it is exculpatory, or because it may be used for impeachment; (b) the evidence not disclosed must have been withheld by the Commonwealth either willfully or inadvertently; and (c) the accused must have been prejudiced.

*Id.*, at 644-45.

Turning to the first issue, there is no dispute that the nondisclosed evidence in this case was favorable to the accused and that it could have been used effectively and extensively for impeachment. As set forth below, the evidence would have allowed the defense to ask Ms. Browning a plethora of additional questions at trial regarding her motive for testifying on behalf of the Commonwealth. The evidence was relevant and important to assessing her credibility as a witness.

There is also no dispute about the second issue. All of the exculpatory evidence described above was in the possession of the Commonwealth and

never disclosed to the defense. Here, the Commonwealth asserts that any failure to provide exculpatory evidence was inadvertent rather than willful. However, it is not necessary to address the claim of inadvertence because this makes no difference under the principles of law that govern the analysis. The court may not even consider such inadvertence; it is irrelevant to the ruling that must be made. On this point, the Supreme Court of the United States made it clear in 1972 that the question of whether a new trial should be granted because of a failure to disclose exculpatory evidence does not turn on the integrity of the Commonwealth or on its good intentions. *Giglio v. United States*, 92 S. Ct. 763 (1972). Rather, the "same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*, at 766. The Supreme Court further stated that "suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution." *Id.*, at 766.

Therefore, the court will now turn to the third element of a *Brady* violation: whether the accused has been prejudiced. This is the only issue that must be resolved in order to rule on the motion that is before the court. Here, whether there was any prejudice to the defense depends on whether the nondisclosed evidence was material. If the evidence was material, as that term has been defined under Virginia law, then the failure to disclose it by the Commonwealth leaves the court with no alternative but to set aside the verdicts. If material evidence is not disclosed to the defense by the prosecution, a new trial must be granted.

Since all that remains for resolution is whether the nondisclosed evidence was material, the court will begin the analysis by setting forth the principles of law that must be followed on this issue. The Supreme Court of Virginia carefully explained the standard that the court must apply to the determination of whether the nondisclosed evidence is material in *Workman, supra*. The court noted that "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*, at 645. The court also said that to establish materiality, the defendant does not have to demonstrate "that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal" or "that, after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.*, at 645. Rather, the court must conduct a collective review of the evidence and consider whether the withholding of such evidence "undermines confidence in the outcome of the trial." *Id.*, at 645.

Furthermore, in determining whether confidence in the outcome of the trial has been undermined, one factor that the court must consider is the impact that the nondisclosed evidence had on the ability of the defense to present its case. The Supreme Court of Virginia stressed this point in *Bowman v. Commonwealth*, 248 Va. 130, 445 S.E.2d 110 (1994). There,

the court said that, once the exculpatory evidence in question was not provided by the Commonwealth, "it was reasonable for defense counsel to assume that no such defense evidence existed and to make pretrial and trial decisions on the basis of this assumption. (Citations omitted.) Under these circumstances, there is a reasonable probability that the outcome of the trial would have been different, had the prosecution provided this evidence to the defense prior to trial." *Id.*, at 135.

What *Bowman* makes clear is that the defendant is under no obligation to investigate whether there might be some exculpatory evidence or to surmise what role a prosecution witness might be playing in a case. Rather, when a request is made and the court enters a discovery order that requires the production of the evidence, the defense is entitled to rely fully on what is actually disclosed by the Commonwealth. Most important, in preparing for trial and in making decisions about how to proceed in court, the defendant is also able to conclude that if it is not disclosed it does not exist. The Court of Appeals explained why in *Boney v. Commonwealth*, 16 Va. App. 638, 432 S.E.2d 7 (1993). With regard to the impact that nondisclosed exculpatory evidence can have on the performance of defense counsel, the court said: "the evidence would have affected defense counsel's trial preparation, assisted it in cross-examining witnesses, and may have led defense counsel to other evidence in the case. . . ." *Id.*, at 646.

The court will next analyze whether the nondisclosed evidence in this case was material under the standard that has been articulated in *Workman, Bowman*, and *Boney*. In order to perform this task thoroughly and properly, it is necessary to quote at length some of the responses that Ms. Browning gave to a number of questions that were posed at trial. These include questions that were asked by the Commonwealth and the defense. The court must also refer to some of the points that were emphasized in closing argument regarding Ms. Browning's credibility. This must be done so that the precise answers she gave at trial can be examined and then compared to the evidence that was not disclosed.

Turning to the direct examination of Ms. Browning by the Commonwealth's Attorney, the following evidence was elicited regarding why Ms. Browning was in jail at the time that she testified, whether she would receive any benefit from her testimony, and whether any promises had been made to her:

> Q. All right. Now, Ms. Browning, you are currently incarcerated in the Central Virginia Regional Jail?
> A. Yes, ma'am.
> Q. And why is that?
> A. Because I had bond and my sister signed it and because of family problems. . . .

A. Because I had my bond, my sister signed it, but, because of family problems, she revoked it on me.

Q. But why do you have a bond? What's the bond for? What are your charges that the bond attached to?

A. Oh, I have drug charges.

Q. And did that come out of a search that occurred at your and Jamie's house after all of this?

A. Yes, ma'am.

Q. All right. And let me just ask you this, *have you been promised anything* by the Commonwealth?

A. No, ma'am.

(Emphasis mine.)

On cross-examination, Ms. Browning was at one point handed a number of court orders that set forth the multiple continuances that had been granted in her cases. In explaining to the jury why her case had been delayed, Ms. Browning denied that the delay was connected to her testimony against Mr. Long. She also said that she did not expect to receive any benefit for her testimony:

Q. Does your name appear on those documents, ma'am?

A. Yes, I see it.

Q. All right, and do they represent all the dates that your case was postponed in Orange County Circuit Court?

A. I assume so, yeah.

Q. Do you know why the case has been continued for over a year?

A. Because I've allowed it to.

Q. Are you telling this jury that you allowed it to be continued because you wanted to wait until you testified in this case?

A. No, sir.

Q. So your testimony in this case has nothing to do with postponing your cases?

A. No, sir.

Q. So your testifying here is something that you don't think will benefit you?

A. No, sir.

Q. By benefiting, you know what I mean?

A. *I know what you mean.*

Q. You know what those terms mean?

A. Yes, sir.

Q. Benefiting you would be to maybe get you released from jail?

A. *Yes, sir, I realize what you're saying.*

Q. Right, and your testifying is unrelated to when you get out of jail as far as you know?
A. Right.
Q. And you want this jury to believe that?
A. Yes, sir, I do.

(Emphasis mine.)

On redirect examination, the Commonwealth's Attorney asked the following question:

Q. Was there *ever* any agreement between you and the Commonwealth and you and the law enforcement officers, or *any message at all relayed to you by your lawyer* or directly to you that *telling the truth or cooperating* would get you out of jail or get you a bond, get you a better sentence, *get you anything?*
A. No, ma'am.

(Emphasis mine.)

On recross, Ms. Browning again told the jury that her decision to stay in jail and continue her case was not related to her trial testimony:

Q. Over a year, this is August and almost a year and half, you think — you don't know of any reason why it's been continued for a year and a half?
A. It's been my decision to continue it.
Q. Your decision to stay in jail, why — what benefit would it be for you to continue a case —
A. Because if I got out, I would have to come back to jail because I'm probably going to get time for it, so — I mean, go ahead and stay in and do the time and then get out.

In her closing argument, the Commonwealth's Attorney pointed out how significant Ms. Browning's testimony was to the prosecution. She also urged the jury to accept as credible Ms. Browning's statements that she was promised nothing and that she was not expecting to receive any benefit for her testimony:

We know that she told you she doesn't have a deal with the Commonwealth. . . . She's been doing her time ever since and what did she tell you, she figured she was going to get some time and she just rather put the time in. The case has been put off, that's what she told you. There's nothing to dispute that. .

. . You judge the credibility of the witness. She said she's got some time coming, she might as well be getting it done.

In rebuttal, the Commonwealth's Attorney last point was to urge the jury to believe Robin Browning: "She may not be a perfect person, she may not be a saint, that doesn't make her not believable when she comes in here and tells you these things under oath."

The above portions of the trial transcript must now be compared to the exculpatory evidence that was not disclosed. As noted above, Ms. Browning testified unequivocally that she had been promised nothing by the Commonwealth; that she made her own decision simply to stay in jail until her cases were completed; and that the continuance of her cases had nothing to do with her testimony against the defendant at trial. At best, these answers are in direct conflict with the items of exculpatory evidence that were not disclosed to the defense. At worst, it can be argued that she knowingly testified untruthfully as to material facts in connection with her case.

To illustrate the extent to which the nondisclosed evidence could possibly have undermined Ms. Browning's credibility, the court must note the barrage of rather sharp questions that she would have been asked had the evidence been made available. For example, when she continually denied getting "anything" in exchange for her cooperation and testimony, she would have been asked whether she considered the Commonwealth's decision not to charge her with participating in the murders to be a benefit. If she had said that relieving her of the risks and burdens of a murder prosecution was not necessarily a benefit, she would have been asked if it amounted to "anything." She would also have been asked if the Commonwealth's Attorney's decision not to prosecute her for the murders was the real reason that she agreed to cooperate and to appear in court. She would have been questioned about her knowledge of the meetings and discussions about her case that occurred between her attorneys and the Commonwealth's Attorney. She would have been directed in court to look at the generous plea agreement that had been offered to her by the Commonwealth a few months before she took the witness stand. She would have then been asked whether the promises contained in the agreement were of any benefit to her. She would also have been asked why she turned the agreement down and whether she was expecting to receive a better offer after she gave her testimony against Mr. Long.

The court would obviously be speculating or engaging in conjecture if it attempted to surmise how Ms. Browning would respond to such inquiries or if it tried to predict exactly what effect her answers might have had on the jury verdicts. As the *Workman* court made clear, however, the question of whether the verdicts should be set aside has nothing to do with whether the nondisclosed evidence would have resulted in the defendant's

acquittal. No judge or attorney can know with certainty the outcome of any trial. Rather, the key point is whether the outcome and the presentation of the defense at trial might have been affected by the availability of the exculpatory evidence. Here, in the court's view, the jury was entitled to learn of this evidence and to hear Ms. Browning's answers to the questions about it. Her testimony might have been received as truthful or it might have been rejected as untruthful; however, the outcome of this critical jury question would have been substantially affected by the nondisclosed evidence. The jury had the right to hear about the evidence because the jury had to decide whether to believe Ms. Browning, as the Commonwealth strongly urged it to, or to disbelieve her, as was vigorously argued by the defense. Without the exculpatory information regarding Ms. Browning's arrangements with the Commonwealth, the jury did not have before it all of the relevant and necessary evidence to evaluate her credibility. As a result, confidence in the outcome of the trial has been undermined.

Now that the court has found that the nondisclosed evidence was material, the cases that have addressed and analyzed this issue will be examined. It is necessary to discuss these cases to ascertain if they provide any support for the court's conclusion. The cases must also be reviewed to see if the reasoning that has been cited and followed by the courts that decided them is consistent with the rationale relied on in this letter opinion.

To begin with, it should be noted that many of the reported cases present factual circumstances that are extremely similar to those that can be found in the record of Mr. Long's case. It is also important to emphasize that such cases have been handed down by the three courts whose decisions are binding on this court: the Supreme Court of the United States, the Supreme Court of Virginia, and the Virginia Court of Appeals. All of the cases overwhelmingly demonstrate that the verdicts here must be set aside.

First, the leading case on the subject is *Giglio, supra*. The opinion was handed down by the United States Supreme Court, and it is directly on point. *Giglio* is well established law, and its rationale has been followed and cited many times by the Supreme Court of Virginia and the Virginia Court of Appeals. There, the main prosecution witness was an alleged co-conspirator with Giglio in the criminal enterprise that was the subject of the criminal trial. Before the case went to trial, the witness was promised that he would not be named as a defendant and that he would not be prosecuted. The promise was made by the prosecutor who presented the case to the grand jury for the government. As a result, the witness cooperated with the prosecution and testified against Giglio at trial. On cross-examination at trial, however, the witness denied that a promise had been made not to prosecute him. After Giglio was convicted, a post trial motion was filed to set aside the verdict because the promise had not been disclosed to the defense. The government attempted to salvage the verdict by asserting that the assistant prosecutor who made the promise to the witness was not

involved in Giglio's trial; therefore, the prosecutor who actually examined the witness at trial did not have personal knowledge of the promise made by his colleague. The United States Supreme Court rejected all of the government's arguments and reversed the conviction for the simple reason that the promise not to prosecute was not disclosed. It made no difference whether the prosecutor who appeared in court was not personally aware of or had no knowledge of the promise. On this point, the court stressed how critical the testimony of the witness was to the outcome of the trial:

> Taliento's credibility as a witness was therefore an important issue in the case, and *evidence of any understanding or agreement as to a future prosecution would be relevant* to his credibility and *the jury was entitled to know of it*. For these reasons, the due process requirements enunciated in *Napue* and the other cases cited earlier require a new trial, and the judgment of conviction is therefore reversed and the case is remanded for further proceedings consistent with this opinion.

*Id.*, at 766 (emphasis mine).

The circumstances in the case before the court are virtually identical to those that were central to the decision in *Giglio*. At trial, Ms. Browning was asked multiple times whether the Commonwealth made any promise to her or conferred any benefit on her. Like the witness in *Giglio*, she answered "No," and denied in the presence of the jury that she had received anything from the Commonwealth. Nevertheless, just like the witness in *Giglio*, Ms. Browning had been promised before she took the witness stand that she would not be prosecuted for the crimes about which she testified. In addition, she expected to receive some benefit in connection with the charges pending against her once she completed her testimony against Mr. Long. Thus, standing alone, the facts and the reasoning of *Giglio* require that the verdicts here be set aside.

Nevertheless, it must be emphasized that several additional Virginia cases are equally persuasive. To begin with, the case of *Walker v. Commonwealth*, 4 Va. App. 286, 356 S.E.2d 853 (1987), must be considered because the factual circumstances there are also very similar to those that can be found in the case before the court. In *Walker*, the primary witness for the Commonwealth was an accomplice of the defendant. Prior to trial, the accomplice had reached a plea agreement with the Commonwealth and had also made a prior inconsistent statement to a police officer during the initial phase of the investigation. A specific request was made by the defense for this exculpatory evidence, and the Commonwealth declined to disclose it. When the case was tried, the defendant was convicted of breaking and entering and grand larceny. Subsequently, the nondisclosed information

was discovered by the defense, and a motion was made for a new trial. The trial judge denied the motion.

The Virginia Court of Appeals reversed the trial judge and ordered that the defendant be granted a new trial. The court concluded that the requested information should have been made available and that it had a significant impact on the case: "We believe that the lack of disclosure of the plea agreements known to exist by the prosecution and the prior inconsistent statements made by Hunnell had an effect on Walker's defense; the information should have been disclosed since it was specifically requested and undeniably material to the case." *Id.*, at 300. The court went on to state that "the fact remains that the defendant specifically requested the disclosure of exculpatory material in the Commonwealth's possession and was entitled to the information." *Id.*, at 300.

The case before the court closely parallels *Walker*. There, the Commonwealth made promises to its key witness in a plea agreement. Here, the Commonwealth made a formal promise to the witness that she would not be prosecuted for the murders and that she would receive some benefit for her testimony on the charges pending against her. In both cases, the exculpatory evidence was requested by the defense and was not disclosed. In both cases, the evidence was material and would have a significant impact on the defense. In addition, in each case, the importance of the exculpatory evidence to the defendant was its potential for use in cross-examining and impeaching one of the main witnesses for the Commonwealth. Therefore, the rationale of *Walker*, which is an appellate decision that is binding on this court, strongly supports the conclusion that the verdicts must be set aside.

Yet another case that is somewhat similar to the one before the court is *Burrows v. Commonwealth*, 17 Va. App. 469, 438 S.E.2d 300 (1993). The defendant in *Burrows* was convicted of the first degree murder of his wife and the use of a firearm in the commission of the murder. At trial, one of the most important witnesses to testify for the Commonwealth was a man named Theodore Fore. He testified that he and the defendant had become close friends during the time that they spent together in jail. Fore said that the defendant admitted to him that he planned and then committed his wife's murder. He testified that the defendant talked constantly of the crime.

Prior to trial, the Commonwealth failed to disclose important information regarding Fore's past criminal record. In addition, the Commonwealth did not reveal exculpatory evidence that pertained to Fore's relationship with the Commonwealth. Specifically, there were a number of charges pending against him from other jurisdictions that might have been dismissed or not pursued because of some agreement or arrangement that he had with the Commonwealth.

Once again, the Virginia Court of Appeals reversed the defendant's convictions and remanded the case for a new trial because of the

Commonwealth's failure to disclose the exculpatory evidence. Most important, the court stated clearly that a verdict must be set aside when evidence that affects the credibility of a crucial witness is not provided to the defense. The court said that "reversal is the proper remedy when that evidence clearly tends to exculpate the defendant or otherwise depreciates the value of testimony or evidence central to the prosecution's case. When the reliability of a given witness may well be determinative of guilt or innocence, evidence affecting the credibility of that witness should not be concealed by the prosecution." *Id.*, at 472.

Many other Virginia cases have concluded that evidence not disclosed by the prosecution was material and that verdicts reached in the absence of such evidence must be set aside. One example of such a case is *Bowman, supra.* There, the trial judge refused to order the disclosure of a report that could have been used to impeach a Commonwealth witness who identified the defendant as the perpetrator of the crime. On appeal, the Virginia Court of Appeals actually upheld the trial judge's ruling and affirmed the defendant's conviction for distribution of cocaine. The Supreme Court of Virginia, however, reversed this decision and determined that the trial judge committed error by not requiring the Commonwealth to disclose the evidence. The court found that the evidence was material to the ability of the defense to proceed and justified the granting of a new trial.

Another relevant case is *Dozier v. Commonwealth*, 219 Va. 1113, 253 S.E.2d 655 (1979). In *Dozier*, the defendant moved for a new trial on the abduction charge for which he was convicted because the Commonwealth failed to disclose an inconsistent statement given by the principal witness for the Commonwealth, a woman named Cindy. The trial judge denied the motion, and the Supreme Court reversed this decision. In finding that the statement was both exculpatory and material, the court again confirmed that evidence that can be used to impeach a key witness must be disclosed. The court said that the "exculpatory value of Cindy's extra-judicial statement was its utility for discrediting her as a witness." *Id.*, at 1118. The court went on to explain that, even though the nondisclosed evidence would be relevant only to a determination of the credibility of a witness, "it is as material in the constitutional sense as evidence which goes directly to the question of guilt where the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Id.*, at 1118.

Continuing, the same result was reached by the Virginia Court of Appeals in *Boney, supra.* The defendant there had been convicted of several serious crimes, including first degree murder. On appeal, the convictions were reversed, and a new trial was ordered. One of the reasons for the reversal was that the trial judge committed error by not directing the Commonwealth to disclose the names and statements of two witnesses who testified for the Commonwealth. Similar to the evidence regarding Robin

Browning in the present case, the evidence in *Boney* was relevant only on the issues of impeachment and the credibility of witnesses.

Another case that supports the court's reasoning here is *Cherricks v. Commonwealth*, 11 Va. App. 96, 396 S.E.2d 397 (1990). There, the Commonwealth failed to provide the defense with an exculpatory statement made by a potential witness named Robin Cherrix. Prior to trial, the defense had requested the statement from the Commonwealth, and the trial judge refused to order that it be disclosed. The Virginia Court of Appeals found that this was error and reversed the defendant's conviction for statutory burglary and grand larceny.

The *Cherricks* case is significant for two reasons. First, on the question of whether nondisclosed evidence was material, the case verifies that the court's inquiry has nothing to do with whether the use of the evidence would have led to an acquittal. Rather, if the nondisclosed evidence might have had a significant impact on the ability of the defense to proceed with its case, it is material. As the court explained: "Robin Cherrix was the only person with the appellant when he allegedly committed the crimes. The Commonwealth's case against the appellant was largely circumstantial. Under such circumstances, her statement supporting the appellant's claim of innocence, although contradictory to one given earlier, might have affected the outcome of the first trial; therefore, the failure of the trial court to require the Commonwealth to disclose the statement in this case was error." *Id.*, at 101-02.

Second, the court acknowledged the difficulties that often arise in criminal cases when exculpatory evidence is in the possession of the Commonwealth. What the court made clear about the law, however, is that the problem of exculpatory evidence in a criminal trial is one that the Commonwealth must address and correctly resolve. A failure to disclose exculpatory evidence for any reason places in serious jeopardy any verdict obtained without it. As the court explained:

> Tension exists in instances where the prosecution does not recognize the exculpatory nature of evidence, or, as here, in good faith denies the exculpatory potential of the evidence and accordingly declines its production. . . . When the Commonwealth elects to withhold exculpatory evidence on the ground that it is not material, it does so at its own peril and with the realization that the trial court or an appellate court may hold otherwise, thereby invalidating a conviction.

*Id.*, at 101-02.

Finally, as part of this discussion, yet another Virginia case in which the defendant's conviction was reversed must be examined. Specifically, in *Keener v. Commonwealth*, 8 Va. App. 208, 380 S.E.2d 21 (1989), the reversal

of the conviction and the awarding of a new trial were ordered even though the exculpatory evidence in dispute was actually disclosed to the defense by the Commonwealth. In *Keener*, the defendant was being prosecuted for possession of a controlled substance with the intent to distribute. The disputed information pertained to the identity of an informant; defense counsel needed this information so that he could determine how to proceed at trial. The Commonwealth actually made the disclosure; however, this was not done until after the jury had been selected and the Commonwealth had presented its case. Since the disclosure occurred at a late phase of the proceedings, the defendant moved for a mistrial; however, the trial judge denied the defendant's motion because the evidence had been made available before the conclusion of the case.

On appeal, the Virginia Court of Appeals reversed the trial judge. The court concluded that, even though the information had been provided to the defense, a mistrial should have been declared and the defendant should have been given an opportunity for a new trial. Consistent with the other cases cited here, the *Keener* court found that the nondisclosed evidence was material because it would have been important to Keener's defense. The court explained that a "reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. In the present case, the Commonwealth's failure to disclose the identity of the informant until after the commencement of the proceedings clearly had an effect on Keener's defense." *Id.*, at 216.

All of the above cases share a common theme: important exculpatory evidence that could be used to impeach a crucial Commonwealth witness or that would be favorable to the accused on the question of guilt or innocence was not disclosed to the defense by the prosecution prior to trial. The result in every case was the same. The court ruled that the exculpatory evidence was material; that the verdict had to be set aside; and that a new trial had to be granted to the defendant. Furthermore, whenever the evidence included a benefit, a promise, or any consideration for a witness who provided important testimony for the Commonwealth, the Supreme Court of the United States, the Supreme Court of Virginia, and the Virginia Court of Appeals have consistently ruled that any verdict reached without the disclosure of such evidence must be set aside.

### Conclusion

The court's abiding and profound respect for jury verdicts is well known. The court is reluctant to overturn the collective judgment of a jury that has heard and decided a case. Only unusual and compelling circumstances lead the court to consider whether such judicial action is merited. Nevertheless, such sentiments must never interfere with the court's responsibility to follow the mandate of the law that controls the issue that

must be decided. They must yield to the proper administration of justice, which requires that the law be applied in an objective fashion to the facts of each case. Above all things, the court must ensure that every phase of every trial is fair, impartial, and governed by the rule of law.

In the trial that was conducted here, Robin Browning was one of the most important witnesses to testify against the defendant. The jury's assessment of her credibility was a critical issue in the case. The Commonwealth failed to disclose exculpatory evidence that was directly related to her credibility as a witness. The nondisclosed evidence was material. Therefore, the law requires that the verdicts be set aside and that a new trial be granted to the defendant.

In light of the court's ruling, the case will be set for a hearing on the earliest possible date. At the hearing, the court will determine how and when the new trial will be scheduled. The court will also address whether any pretrial motions are going to be filed and how such motions will be heard and resolved.